## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **WILLIAM T. FENNEBRESQUE,** §<br><br>§<br>    **Plaintiff/Counterdefendant,** §<br><br>§<br>**v.** §<br><br>§<br>**MARK E. ROZEBOOM,** §<br><br>§<br>    **Defendant/ Counterplaintiff** §<br><br>§<br>—————————————————————— §<br><br>§<br>**MARK E. ROZEBOOM,** §<br><br>§<br>    **Third-party plaintiff,** §<br><br>§<br>**v.** §<br><br>§<br>**NORTH AMERICAN HELIUM, INC.,** §<br>**and CAMP WOODS GAS COMPANY,** §<br>**LLC,** §<br><br>§<br>    **Third Party Defendants.** | **Civil Action No. 3:19-cv-3010** |

---

## MARK ROZEBOOM'S FIRST AMENDED COUNTERCLAIM AND THIRD-PARTY COMPLAINT

---

Mark Rozeboom files this First Amended Counterclaim and Third-Party Complaint as follows:

## INTRODUCTION

This case seeks to hold William T. Fennebresque – a managing partner with Dallas-based Stronghold Resource Partners ("SRP") – accountable for fraud, securities fraud, and a gross abuse of his fiduciary position as a member of North American Helium's ("NAH") board of directors. Fennebresque secured millions of dollars in value in membership unit trades by exploiting the material, non-public information he received in his privileged position on the board. In the most egregious example of his fraudulent conduct, Fennebresque fed misleading and incomplete information to Mark

E. Rozeboom – a unitholder in NAH's parent company, Camp Woods Gas Company ("CWGC") – to justify the purchase of Rozeboom's CWGC units at a third of their actual value. Even though Rozeboom pointedly asked Fennebresque whether he had any undisclosed information that might affect the proposed purchase price, Fennebresque used misleading doublespeak to placate Rozeboom regarding the transaction.



Outwardly, Fennebresque acted out the role of a private investor trading on equal informational footing as Rozeboom. Indeed, Fennebresque told Rozeboom that it was *possible* that because the "company is ALWAYS" fundraising, a capital raise at a much higher valuation "could close next week." Fennebresque hedged, however, that any such raise could take as long as "next quarter."

On Fri, Jul 6, 2018 at 9:50 AM, Billy Fennebresque <billy.fennebresque@srp-ok.com> wrote:

Hi Mark, Good point re 45,000 shares. I was thinking re the $1MM. Would be nice if you owned 450,000 shares, hahaha! The company is ALWAYS doing fundraises and one could close next week or in a quarter, that is why I wanted to make sure you couldn't sue me if anything happened. This is more about liquidity than valuation on your end. If you want to hear my plans re the Company, happy to chat with you about that as well. Think you will be interested as some of your shares I am using as an enticement for another potential partner that I believe will add a ton of value to the business longer term. My cell is 704-641-0155 if you want to talk through it.

But inwardly, Fennebresque knew for a fact a that just three days earlier, NAH's board voted unanimously to ███████████ from a group called Portal Capital for NAH shares at a ███████

valuation. The detailed board meeting minutes from July 3, 2018 show that not only did Fennebresque approve Portal Capital's offer, but he also knew the target closing date was July 16, 2018.



Two days later, NAH issued a proposed term sheet to Portal Capital using a "Current Company Value" of ▮▮▮▮▮▮▮



Just three days after Rozeboom pointedly asked for information affecting the value of his CWGC units, Fennebresque received word from Mr. Snyder ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Then, on July 13, 2018, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

Ten days later, Fennebresque engineered the purchase of 45,000 units of Rozeboom's CWGC shares for $1 million – a third of their true value. **Even though Fennebresque knew that the information he had provided to Rozeboom regarding CWGC's value was wildly inaccurate, he proceeded with the purchase anyway.**

Approximately one year later, Rozeboom stumbled across information exposing Fennebresque's misconduct. When Rozeboom confronted Fennebresque with the information, Fennebresque responded not by discussing his position with Rozeboom, but instead by filing a lawsuit with the Court. As it turns out, discovery in this case has exposed additional illegal and abusive misconduct by Fennebresque. Accordingly, Rozeboom files this First Amended Counterclaim and Third-Party Complaint to address the illegal actions by Fennebresque and others that have now come to light.

Mr. Rozeboom has lost over $4,500,000 in share price appreciation due to the 2017 and 2018 Transactions and has now lost access to nearly $4,500,000 in NAH securities – while engaged in an active lawsuit with a company director.

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff/Counter-defendant William T. Fennebresque is an individual citizen and resident of the State of Texas. Fennebresque has made an appearance in this action.

2. Defendant/Counter-plaintiff Mark E. Rozeboom is an individual citizen and resident of the State of Colorado. Rozeboom has made an appearance in this action.

3. Third-party defendant Camp Woods Gas Company was a limited liability company organized under the laws of the State of Delaware. Upon information and belief CWGC was dissolved in December 2019. CWGC's registered agent for the purpose of service of process is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

4. Third-party defendant North American Helium is a corporation organized under the laws of British Columbia. NAH's principal place of business is 440 2 Ave SW #560, Calgary, AB T2P 5E9, Canada.

5. The Court has jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity between all parties and the amount in controversy exceeds $75,000.

6. The Court has jurisdiction over Fennebresque because he has appeared in this action. The Court has jurisdiction over NAH and CWGC under 15 U.S.C. § 78aa.

7. Venue is proper here under 28 U.S.C. § 1391(b)(2) and 15 U.S.C. § 77.

## RELEVANT FACTUAL BACKGROUND

**A.    Camp Woods Gas Company Is Formed.**

8. In early 2013, Rozeboom and Mr. Snyder formed CWGC as a limited liability company organized under the laws of Delaware. CWGC was initially comprised of friends and family and, as such, retained informal procedures throughout its existence.

9. Shortly after the creation of CWGC, Rozeboom and Snyder, along with the company attorney, Ian Robertson, formed NAH, a wholly owned Canadian subsidiary. Rozeboom, Snyder, and Robertson constituted NAH's initial board.

10. While NAH's shares were owed by CWGC, the LLC functioned solely as a pass-through holding company for the ownership interests of CWGC members, its ultimate beneficial owners. Rozeboom received tax documents commensurate with this arrangement. Day-to-day operations, however, took place at the NAH level.

11. In December of 2014, Mr. Snyder informed Rozeboom that he had decided to replace Rozeboom by directors with public-company and helium-specific experience. Rozeboom ultimately relented because Mr. Snyder repeated that it was the best path to taking the company public.

12. Following his replacement on the Board, Rozeboom did not have an active role in the day-to-day activities, plans, and goals of NAH or CWGC. He received limited disclosure of information regarding the companies through informal email updates sporadically communicated by Mr. Snyder to CWGC's members. The information received omitted key information, including financial reports, financing terms and fundraising status, capital structure details, and shareholder voting announcements.

13. In early 2015, Snyder informed the shareholders of CWGC that the Company was conducting a class AA preferred capital raise at a ~$11 million-dollar valuation. The members of CWGC possessed participation rights in any financing, and Snyder offered members an opportunity to invest alongside the class AA investors in an amount commensurate with retaining equal ownership in the Company. Rozeboom declined to invest, and in June 2015 the Company completed the financing with $1.55 million in proceeds. At that time, Mr. Snyder informed all CWGC shareholders that all future capital raises would take place at the Company's wholly owned subsidiary, NAH.

14.    In connection with the class AA financing, the Company created an Amended and Restated Operating Agreement on February 25, 2015.  Rozeboom was not notified of this amendment and did not receive a copy of the agreement until requesting it in connection with this action. Fennebresque was a signatory to the agreement, having purchased $10,000 of the class AA interests, which contained a confidentiality provision for all members:

> "By virtue of being a Member of the Company, a Member may, from time to time, receive Confidential Information (as hereinafter defined) about the Company **or its Affiliates**. Each Member agrees to take all reasonable steps to prevent disclosure of Confidential Information **and not use any Confidential Information except as may be necessary for the limited purposes set forth in this Agreement**."

(Section 3.11) (emphasis added).

**B.    Fennebresque Joins NAH's Board of Directors.**

15.    In October 2015, NAH completed its first financing transaction, with $2.3 million CAD of class A preferred ($1.60 price) raised at a $30 million valuation.  Fennebresque purchased $263,340 of these shares and was named to  NAH's board of directors. NAH further raised $7 million CAD at $1.90 in March 2016 of class B preferred stock, of which Fennebresque purchased $1,415,000. Next, starting in July 2016, NAH increased the price of class B preferred stock to a $3.30 CAD, representing a $65 million valuation.  This investment round closed in December 2016, having raised $4.3 million CAD in proceeds, with CWGC itself investing $1,219,456.

16.    These capital raises and commensurate valuation increases were not disclosed to CWGC shareholders, despite the substantial increase in the value of their ownership due to CWGC's 78.74% ownership of NAH and 100% voting rights in the subsidiary.

**C.    Mr. Snyder Forces Rozeboom To Redeem 20,500 Shares And Sell 12,000 Shares To Fennebresque For A Mere $25,000, Despite Undisclosed Information Supporting A Much Higher Valuation.**

17.    In January 2017, Mr. Snyder flew to Florida to demand that Rozeboom sell 12,000 of his CWGC shares to Fennebresque for $25,000 ("2017 Fennebresque Transaction"). In addition, Mr.

Snyder demanded that Rozeboom redeem 20,500 of his CWGC shares ("2017 Redemption Transaction"). Mr. Snyder represented that his close friend, Steven Luskey, would be required to redeem 15,000 of his shares as well. Mr. Snyder represented that the redemptions were necessary to keep the Company moving forward. Mr. Snyder further informed Rozeboom that if he did not agree to these actions, Mr. Snyder would simply dilute them and force "non-capital contributors" (*i.e.* Rozeboom) out of the Company.

18.    Rozeboom strongly objected to the terms being forced upon him and repeatedly asked for information and documentation to support Mr. Snyder's valuation of $25,000. In response, Mr. Snyder sent Rozeboom a redacted capitalization table with no other transactional information.

19.    When Rozeboom's challenges persisted, Mr. Snyder threatened that Rozeboom could take the money or be diluted and potentially forced out entirely. Mr. Snyder's actions would prove prescient to his future conduct in which he bragged that he ███████████████████

██



20.    Faced with what Rozeboom believed to be an existential extortion to his position in the Company, Rozeboom agreed to Mr. Snyder's demand in February 2017 (the "2017 Transaction").

It was unbeknownst to Rozeboom, however, that only weeks earlier Mr. Snyder had arranged for Fennebresque to purchase shares from his parents at a substantially higher price. He was also unaware that Snyder himself had also sold shares to Fennebresque.

21. Worse, however, was that Fennebresque was directly involved in the completion of each capital raise at NAH, including the one completed the month before at a valuation for CWGC 5x greater than the level last disclosed to members (~$11 million in mid-2015). In fact, Fennebresque was intimately aware of the "fair market value" of CWGC interests, as the recipient of class B profits interests in the entity.

22. The redacted capitalization table sent by Snyder, though stripped of nearly all identifiable information, contained a new category of ownership in class B profits interests. These interests were granted to "**employees, consultants, advisors or other such persons**." *Amended and Restated Operating Agreement,* section 5.6.1. Further, these interests were issued with a "built-in gain," representing the "fair market value" of CWGC when granted. *Section 5.6.4.*

23. As of February 6, 2017 (date of the capitalization table), there were 75,365 class B interests granted in CWGC, with 31,865 holding a "built-in gain" of $20-55 million.

| (Class B no value below $20-$55 million) | | 31,865 | | | 42% | 2.44% |
|---|---|---|---|---|---|---|

The owners of these interests were redacted by Snyder and remained undisclosed until after this lawsuit was filed, when Fennebresque was properly identified:

| William Fennebresque | 9,075 |
|---|---|
| William Fennebresque | 22,790 |

24. In other words, by the time Fennebresque purchased Rozeboom's shares, he had already received 31,865 class B profits interests issued in "consideration of services provided…for the benefit of the Company by such Employees in a member capacity". *Operating Agreement Section 5.6.3.* The bulk of these interests (22,790) were received when CWGC had a fair-market value of $55 million.



26.    At a [redacted] valuation for NAH, the shares sold or redeemed by Rozeboom were worth $1,666,950. In other words, Mr. Snyder effectively imposed a wealth transfer of $1.65 million from Rozeboom to the controlling shareholders of CWGC, Mr. Snyder and Fennebresque. Thus, despite Mr. Snyder's representation that a forced conversion of Rozeboom's units was "necessary," it now appears that Mr. Snyder forced the issue to secure windfall gains in Mr. Snyder and Fennebresque's favor. If Mr. Snyder or Fennebresque had disclosed what they knew about the value of the company, Rozeboom never would have agreed to the unit redemption.

**D.    Fennebresque Engineers The Purchase And Sale Of 45,000 Of Rozeboom's CWGC Units For $1 Million Based on A ~$60 Million Valuation Of NAH.**

27.    In 2018, Fennebresque approached Rozeboom to purchase an additional 45,000 shares in CWGC ("the 2018 Transaction"). Fennebresque represented that he needed more equity in CWGC to justify the investment of his time and efforts in the company.



28.     Rozeboom was reluctant to sell such a large stake in the company he had co-founded, but was amenable to helping the Company, so long as he received a fair market price. Indeed, when ███████████████████████████████████████████████████████████ Fennebresque, however, knew something Rozeboom didn't: ███████████████████████████████████████████████████████████ ████████████

29.     On June 15, 2018, Rozeboom responded to Fennebresque's message, confessing that he did not have an accurate idea about the value of the privately held CWGC shares.



30.    Fennebresque recommended that Rozeboom reach out to Mr. Snyder for information regarding the valuation. In an email intended for Mr. Synder but mistakenly sent to Fennebresque, Rozeboom further disclosed that he did not have the information needed to properly value his CWGC shares.

| | |
|---|---|
| From: | Mark Rozeboom |
| Sent: | Friday, June 15, 2018 10:47 AM CDT |
| To: | Billy Fennebresque |
| Subject: | Re: Helium |

Hey man,

As you can read below (and I'm sure are aware of), Billy reached out to me regarding the possibility of adding more equity to his position.  Can you give me an update of where things stand?  I just want to make sure I have a roughly accurate idea of where my shares are priced based on capital raises and the current capital structure as well as any additional information you think would be helpful.  I know you have been killing it over there so I'm not super excited at the idea of selling...that being said, I know it would be helpful for you to have Billy stay involved so hopefully we can come up with a good solution.

Thanks,
Mark

Despite the error, Rozeboom's email made it to Snyder within an hour, and he notified Rozeboom if its receipt.

| | |
|---|---|
| **Subject:** | yo |
| **Date:** | Friday, June 15, 2018 at 10:46:26 AM Mountain Daylight Time |
| **From:** | Nicholas Snyder |
| **To:** | Mark Rozeboom new |

Hey man,

Saw your email and Billy said he reached out to you. Happy to give you an update on whatever, let me know. Obviously you have the investor updates but I can fill in numbers or happy to chat. 610-715-1726

Nick

31.    A week later, on June 22, 2018, Fennebresque and Rozeboom spoke on the phone to discuss the proposal.  On that call, Rozeboom first learned of Fennebresque's purchase from Snyder's

**MARK ROZEBOOM'S FIRST AMENDED**
**COUNTERCLAIM AND THIRD-PARTY COMPLAINT**                    **PAGE 12 OF 35**

parents in December 2016. Following the call, Rozeboom requested clarification of the details, and Fennebresque confirmed the purchase.

> When I purchased shares from Martin Snyder is was actually done at $50MM CAD valuation, so it was a $39.5MM USD valuation. It was for Campwood Gas Company shares and the transaction occurred at the very end of 2016 (second week of December).

32.     On June 24, 2018, Rozeboom sent Fennebresque a detailed email proposing to value CWGC at $65.15 million based on a $115 million valuation and Fennebresque's representations that CWGC owned 61% of NAH. Rozeboom reiterated that he did not "have the cap structure, etc." Later that day, Fennebresque responded to Rozeboom's analysis stating, in part, that he was not "sure we are in striking distance to get a deal done at the levels you are looking."  In this message, he also changed the valuation of his purchase from Snyder's parents, now stating it took place at a $38 million USD valuation for ALL of North American Helium.  Fennebresque has since represented that he is unable to find records for this transaction.

33.     Fennebresque represented that he expected the "total valuation of North American Helium to be less than $60MM", due to $20 million of NAH preferred stock with liquidation preference sitting ahead of the CWGC ownership.  To support his valuation, Fennebresque forwarded Rozeboom an email from Mr. Snyder, also from June 24, in which Mr. Snyder expressed his view on the proper way to value CWGC shares. Mr. Snyder explained that based on a $50 million valuation of NAH (50% of the Bessemer level) in September 2017, CWGC shares should be valued at $24.67 per unit. Mr. Snyder then reasoned that because there had "only been minor changes to the NAH cap table since then…you should be able to just multiply US$24.67 per share by whatever premium to a $50 million NAH valuation you are trying to get to." Fennebresque passed Mr. Snyder's analysis on to Rozeboom.

34.     In response, Rozeboom clarified the information being used by Fennebresque in his valuation analysis, which purported to show the "common stock valuation" of NAH.

> **From:** Mark Rozeboom [mailto:mark.e.rozeboom@gmail.com]
> **Sent:** Sunday, June 24, 2018 8:32 PM
> **To:** Billy Fennebresque <billy.fennebresque@srp-ok.com>
> **Subject:** Re: FW: CWGC valuation
>
>
> Got it - think there was some confusion then regarding which part of the capital structure we were discussing valuation on.  Let me look through this and come back to you...so it was $100mm post money for Bessemer and there are $20mm of preferred ahead of a 61% Camp Woods Gas Company ownership, correct?  As you know I'm a trader by training so whatever the market is it is...I was just trying to come up with the right way to value the shares.  So your thought is $60mm-ish for NAH total due to the fact that we own common vs preferred etc?

35.     Fennebresque confirmed, stating, "I think that is right….Really not any different than how I valued it in December 2016." Rozeboom then offered his shares to Fennebresque based on a $40 million valuation for CWGC (~$65 million common stock valuation at NAH).

36.     The analysis presented by Fennebresque, however, omitted a key piece of information: *CWGC ownership represented 61% of the total valuation of NAH, not just the common stock valuation*. At a ▮▮▮▮▮▮▮ total valuation, CWGC's ownership was worth $61 million, NOT 61% of a $65-70 million common stock valuation.  This misrepresentation represented the difference between a $40 million valuation at CWGC and the proper ~$60 million level.

37.     The information provided also failed to disclose an even more significant piece of information – the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

E.      **Throughout Negotiations With Rozeboom, Fennebresque Knew That NAH Was Courting Investors At A Valuation Of Up To** ▮▮▮▮▮

38.     At the time Fennebresque initiated discussions with Rozeboom, NAH had already received ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



39.     This email was followed by another Snyder update six days later, which further solidified NAH's options.



A day later (and three days prior to contacting Rozeboom), Fennebresque and Snyder spoke to the ███████████████████████████████████████████

████████████

   ■   ████████████   ████████████████████████████████████

███████████████████████████████████████████████████████

   ■   ██████████   ████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████







46.     With the transaction formally approved, Fennebresque then proceeded to send Rozeboom an email "confirming" the completion of the transaction.

47.     **On July 16, 2018**, the Portal Capital raise closed.

48.     **On July 23, 2018**, Rozeboom and Fennebresque executed an agreement for the sale of 22,500 CWGC units for $500,000. Fennebresque subsequently arranged for a nearly identical transaction, this time with Lyon Polk as purchaser in lieu of Fennebresque. Notably, the Unit Purchase

Agreement specifically concedes that: "Fennebresque has intimate knowledge of the Company [CWGC]".

49. If Fennebresque had paid Rozeboom the same price per unit as Portal Paid, Rozeboom would have received approximately $3 million.

|  | Number of CWGC Units | CWGC Units Converted to NAH Units (1 CWGC = 16.86 NAH at time) | Purchase Price per NAH Unit (CAD) | Gross Profits from NAH Unit sale to Portal (USD) |
|---|---|---|---|---|
| Value of Rozeboom units using Portal Capital transaction figures | 45,000 | 758,700 | $5.40 CAD | **$3,080,601** |

Instead, Fennebresque and Polk paid Rozeboom $1 million, **$2 million less than the price Fennebresque knew represented the fair market value being transacted at the exact same time.**

50. In August 2018, Mr. Snyder sent an investor update to CWGC shareholders with notification of the 2018 Capital Raise. The update did not contain specific information regarding the timing the transaction was completed, or any reference to the price per share at which it was completed. Rozeboom had no reason to know he had been swindled.

51. Rozeboom would not have sold his shares to Fennebresque or Mr. Polk at the transaction price of the 2018 Transaction if he knew about the Portal Capital raise and other material, non-public information Fennebresque hid.

**F.    NAH Insiders Sell CWGC shares to Portal**

52. On October 9, 2018, Portal Capital directly purchased CWGC shares from NAH insiders at a 20% discount from the NAH investment ($54.72). Ian Robertson (Company counsel,

Board member) sold 1,941 class AA shares and 20,000 class A shares, Bill Young (NAH President and Board Member) and his wife sold 5,539 class AA shares, and Vance Blydo (NAH Officer) sold 5,100 class AA shares.

53.     Perhaps most significantly, Snyder's parents were allowed to sell 2,000 class A shares as well.  In total, Portal purchased 34,580 CWGC shares for $1,892,217, an average of $54.71 per share.

**G.     Snyder Sells Shares to Fennebresque**





**H.    Rozeboom Discovers The Fraud.**

54.    While preparing net worth documents in November 2019, Rozeboom contacted Mr. Snyder about the 2018 Transaction. In that exchange, Rozeboom learned – for the first time – that at the time of the 2018 Transaction, his shares were worth approximately three times the value he had been told by Fennebresque. Rozeboom began conducting his own independent research and confirmed his suspicions through NAH's regulatory filings with the British Columbia securities authorities.

55.    In December 2019, Rozeboom flew to New York City to meet with Mr. Snyder in person and gather any additional facts available.  During that meeting, Rozeboom presented Mr. Snyder with the regulatory filings and asked about the timing of the transaction. Mr. Snyder represented that he did not remember the 2018 Transaction. Rozeboom detailed the facts of both the 2017 and 2018 Transactions and expressed concerns that, if true, the transactions could violate securities laws. Mr. Snyder denied that the company had any involvement in the 2018 Transaction and encouraged Rozeboom to take the matter up with Fennebresque.

56.    The next morning, therefore, Rozeboom sent an e-mail to Fennebresque notifying him that Rozeboom had discovered the price disparities in both the 2017 and 2018 transactions.

Rozeboom requested that the two resolve the dispute informally to protect the Company and Fennebresque's reputation, and gave Fennebresque one week to respond to the offer. In response, Fennebresque's counsel sent a letter to Rozeboom dated December 18, 2019, stating that suit had been filed against him in the Northern District of Texas.

57.     The letter gave a 24-hour deadline to dismiss the lawsuit in exchange for a release of all claims. When Rozeboom did not respond, Fennebresque filed this action.

## I.     CWGC is Dissolved.

58.     Mr. Snyder had previously represented to shareholders (including Mr. Rozeboom) that CWGC hoped to distribute its NAH shares by year-end, in connection with an additional investment that occurred on December 6, 2019, by Portal Capital.



60.     This process involved first distributing the NAH shares to members of CWGC.  Upon this distribution, the consent resolution signed by members would become effective and the minimal cash in the entity would be similarly distributed in cancelling the member interests.  Finally, CWGC would be merged into a shell, dissolving the entity.

63.     To summarize, on the same day Fennebresque filed this lawsuit, CWGC was dissolved.

64.     Mr. Rozeboom never received any information regarding the shareholder vote, nor the proposed transaction until after its completion.   Four days later, Mr. Rozeboom received notification of the distribution from CWGC.

65.     Rozeboom was faced with the forced-seller's dilemma: either own shares in a non-existent company or agree to convert his CWGC units to NAH units. Ultimately, Rozeboom elected to have his CWGC units converted. Before agreeing, however Rozeboom asked who had sold

66.     Almost immediately, Mr. Snyder and NAH began leveraging the forced conversion to Rozeboom's detriment. Among other things, Rozeboom has sought documents and information regarding CWGC. NAH's corporate secretary flatly rejected the request stating: "The entity no longer exists and I've been advised not to send any tax returns or other documents that contain confidential information regarding others."

67.     NAH has also taken the position that it will not allow Rozeboom to sell even one of his 917,180 NAH units. On June 9, 2020, Mr. Snyder first represented that NAH was blocking all secondary market sales to funnel any investment into NAH "to finance our unfunded capital plans."

68.     Recently, NAH offered a limited share buyback to select shareholders, including Rozeboom. The buyback however requires a broad release of all claims shareholders have, or might have, against board members, regardless of whether the claims have anything to do with the proposed share purchase. In other words, before NAH will buy back Rozeboom's shares, Rozeboom must agree to release Fennebresque from the claims in this case.

69.     Clearly NAH has taken the misguided position of preventing Rozeboom from selling shares in the hopes of quietly resolving Fennebresque's fraudulent conduct.

## COUNTERCLAIMS

**Counterclaim Count I:  Violation of the Securities Exchange Act of 1934 with Respect to the 2018 Transaction (Fennebresque)**

70. Rozeboom incorporates the foregoing factual statements in paragraphs 1-69.

71. Fennebresque omitted the existence of the 2018 Capital Raise, the level of investor interest in NAH, and his additional purchase of CWGC units from Snyder prior to the 2017 Transaction.

72. Fennebresque misrepresented the proper valuation for CWGC and the purchase price of his CWGC shares in his transaction with Snyder's parents.

73. Fennebresque's misleading statements and omissions were made in the context of the sale of securities – Rozeboom's membership units.

74. Because of Fennebresque's misrepresentations and omissions, Rozeboom sold his shares at approximately 1/3 of their actual value, resulting a loss of approximately $2 million to Rozeboom and an equivalent windfall to Fennebresque and Polk.

75. Fennebresque intended that Rozeboom to rely on his misrepresentations and omissions. Indeed, when Mr. Snyder later represented to Rozeboom that there were no events or transactions that would impact the valuation of his shares at $1 million, Fennebresque continued to hide the 2018 Capital Raise that valued Rozeboom's shares at three times the offered rate.

76. Fennebresque has realized profits of over $1 million based on his illegal conduct and bestowed a similar windfall gain upon Mr. Polk.

77. Fennebresque was aware of material non-public information while entering, negotiating, and executing the 2018 Transaction including, but not limited to:  Portal investment at $125 million valuation in April 2018, multiple investment offers at a common stock valuation over 2x greater than the "current mix" offered to investors, prospective capital raise of $50+ million from a top-tier investment bank, completion of the 2018 Capital Raise.

78.     Fennebresque owed duties of trust or confidence to CWGC, its members including Rozeboom, and NAH.

79.     As a board member of NAH, there was an unbroken chain of duties running from Fennebresque to NAH to CWGC, as its majority shareholder.

80.     As a board member of NAH, Fennebresque served as a "human controller" of property owned by CWGC and owed a duty to its beneficial owners, the members of CWGC.

81.     Fennebresque owed a duty to CWGC members to not use or disclose confidential information received as a member regarding CWGC or NAH, and misappropriated material non-public information for personal profit.

82.     Fennebresque was a "temporary insider" at CWGC, having entered into a special confidential relationship with the Company whereby he was given access to material non-public information solely for corporate purposes.  He provided fundraising services for the Company as an "employee, consultant, advisor, or other such person" and received class B profits interests as consideration for this role.

83.     Fennebresque misappropriated confidential information received as a board member of NAH for personal advantage.

84.     Fennebresque served as a "tipper" by conveying the material non-public information in his possession to Lyon Polk, and even went so far as to negotiate the purchase on his behalf in expectation of personal benefit.

85.     Fennebresque owed a duty to disclose as the party to a transaction possessing superior knowledge which was not readily accessible to Rozeboom, and knew Rozeboom was acting on the basis of mistaken knowledge.

86.     Fennebresque committed insider trading, in violation of section 10(b) of the Exchange Act, by purchasing CWGC securities while aware of material nonpublic information about the issuer

or security, in breach of a duty of trust or confidence owed to the issuer, its shareholders, or the source of the information.

**Counterclaim Count II:  Violation of the Securities Exchange Act of 1934 with Respect to the 2017 Fennebresque Transaction - Fennebresque**

87.     Rozeboom incorporates the foregoing factual statements in paragraphs 1-69.

88.     Fennebresque omitted or failed to disclose his fundraising activities, capital raises, and purchase of Mr. Snyder and his parents' membership units when he purchased 12,000 units from Rozeboom for $25,000 in 2017.

89.     Because of Fennebresque's omissions and non-disclosures, Rozeboom sold his shares at an extraordinary discount to their true value – resulting in a loss of approximately $590,000 to Rozeboom and an equivalent windfall to Fennebresque.

90.     Fennebresque's intentional omissions and non-disclosures were made in the context of the sale of securities – Rozeboom's membership units.

91.     Fennebresque was aware of material non-public information during the 2017 Fennebresque Transaction including, but not limited to:  ongoing and completed capital raises at NAH at substantially higher valuations than those disclosed to other CWGC members, Bessemer entry into exclusive due diligence period and proposed terms for a $10-15 million investment at a $85 million pre-money valuation, purchase of Snyder and his parents membership units and associated market value for CWGC shares (~19x greater than the valuation associated with the 2017 Fennebresque Transaction)

92.     Specifically, Fennebresque appears to have received class B profits interests based on a fair market CWGC value of $55 million – ~27x greater than the valuation used to purchase Rozeboom's interests.

93.     Fennebresque owed duties of trust or confidence to CWGC, its members including Rozeboom, and NAH.

94.     Fennebresque committed insider trading, in violation of section 10(b) of the Exchange Act, by purchasing CWGC securities while aware of material nonpublic information affecting the issuer or security, in breach of a duty of trust or confidence.

**Counterclaim Count III – Common Law Fraud by Non-disclosure with Respect to the 2018 Transaction and 2017 Transactions (Fennebresque)**

95.     Rozeboom incorporates the foregoing factual statements in paragraphs 1-69.

96.     Fennebresque concealed or otherwise failed to disclose relevant information about the 2018 Capital Raise and the value of Rozeboom's shares while negotiating the sale of Rozeboom's shares as part of the 2018 Transaction. Similarly, Fennebresque concealed or otherwise failed to disclose relevant information about the 2017 capital raise and the purchase of units from Mr. Snyder's parents at much higher valuations as part of the 2017 Transaction.

97.     Fennebresque had a duty to disclose such information given the fiduciary relationship between them. Moreover, even absent any fiduciary relationship, Fennebresque made a false impression by making a partial disclosure, and Fennebresque disclosed some information but not all relevant information.

98.     Among other things, despite being asked whether a "concurrent" capital raise was happening, Fennebresque did not truthfully answer "yes," opting instead to give vague platitudes about fundraising always happening. The information about the 2018 Capital Raise, as well as the 2017 capital raise and purchase of chares from Mr. Snyder's parents was material and ought to have been disclosed to provide a full picture of the misleading information that had been provided.

99.     The information that Fennebresque withheld was material.

100.    At the time of Fennebresque's partial disclosure, he knew that Rozeboom did not know the information that was withheld and knew that Rozeboom did not have an equal opportunity to discover that information.

101.    Fennebresque was deliberately silent despite his obligation to speak.

102.     Fennebresque intended to induce Rozeboom to sell shares without knowing their full value.

103.     Rozeboom justifiably relied on the information, and lack of information, provided by Fennebresque.

104.     As a direct and proximate result of Fennebresque's failure to disclose material information, Rozeboom agreed to sell shares at an inadequate price and therefore suffered injury.

### Counterclaim Count IV – Violation of the Texas Securities Act (Fennebresque)

105.     Rozeboom incorporates the foregoing factual statements in paragraphs 1-69.

106.     Texas Revised Civil Statutes, art. 581-33(B), creates a cause of action for a seller of a security who was induced by the affirmative fraud or fraudulent omission of material facts by the buyer of a security, and permits such seller to recover against said buyer.

107.     The shares that Rozeboom sold to Fennebresque are "securities" within the meaning of the statute.

108.     Fennebresque is a "buyer" within the meaning of the statute, because he offered to buy and bought securities for value.

109.     Rozeboom is a "seller" within the meaning of the statute, because he disposed of securities in exchange for value.

110.     Fennebresque offered to buy and bought securities from Rozeboom by means of omission to state material facts.

111.     Fennebresque offered to buy and bought securities from Rozeboom by means of untrue statements, partial disclosures, and creating a false impression.

112.     The material facts which Fennebresque withheld from Rozeboom were necessary to make the representations actually made by Fennebresque, given the surrounding circumstances, not misleading.

113.     Without the material facts which Fennebresque withheld from Rozeboom, the representations which Fennebresque did make were misleading.

114.     As a result of Fennebresque's intentional misrepresentations and omissions, Rozeboom sold his shares at a significantly discounted value, resulting in harm to him and a windfall to Fennebresque.

115.     As a result of Fennebresque's intentional misrepresentations and omissions, Rozeboom sold his shares at a significantly discounted value, resulting in harm to him and a windfall to Polk.

**Counterclaim Count V: Negligent Misrepresentation (Fennebresque)**

116.     Rozeboom incorporates the foregoing factual statements in paragraphs 1-69.

117.      Fennebresque made partial disclosures and created a false impression to Rozeboom during the context of their stock transaction.

118.      Because Rozeboom asked whether relevant capital raises would affect the value of his shares, the fiduciary relationship between them, Fennebresque made a false impression by making a partial disclosure, and Fennebresque disclosed some information but not all relevant information, Fennebresque had a duty to disclose his knowledge of contemporaneous and relevant capital raises.

119.     Fennebresque breached his duty to disclose relevant and material information.

120.     Fennebresque did not use reasonable care while speaking with Rozeboom.

121.     Rozeboom justifiably relied on his conversations with Fennebresque.

122.     As a direct and proximate result of Fennebresque's failure to communicate relevant information, Rozeboom sold his shares at an inadequate price.

**Counterclaim Count VI: Breach of Fiduciary Duty in the 2017 and 2018 Transactions (Fennebresque)**

123.     Rozeboom incorporates the foregoing factual statements in paragraphs 1-69.

124. Fennebresque owed a fiduciary duty to Rozeboom given the circumstances of the 2017 and 2018 Transactions including but not limited to, Fennebresque's status as a "temporary insider" of CWGC;  Fennebresque's role as a "human controller" of an entity fiduciary;  the "unbroken chain" of fiduciary duties running from Fennebresque to Rozeboom; Fennebresque's activities as a controlling group" member with Snyder; and Fennebresque's role as a board member at NAH, which was created by CWGC as the operating entity to the pass-through holding Company in CWGC, and the companies operated as a single economic entity.

125. Accordingly, Fennebresque owed a "formal" fiduciary duty, or, alternatively, an "informal" fiduciary duty, to Rozeboom.

126. In the 2017 Fennebresque Transaction, Fennebresque breached his fiduciary obligations to Rozeboom by failing to disclose relevant, material information and purchasing Rozeboom's shares at a grossly inadequate price.

127. In the 2018 Transaction, Fennebresque breached his fiduciary obligations to Rozeboom by failing to disclose relevant, material information in negotiating for himself and Polk, requesting and purchasing Rozeboom's shares at an inadequate price, and structuring and executing Polk's purchase at an inadequate price.

128. As a direct and proximate result of Fennebresque's breach of fiduciary duties, Rozeboom sold his shares at an inadequate price to Fennebresque and Polk and the two parties improperly retained such benefits.

**Counterclaim Count VII: Statutory Fraud (Fennebresque)**

129. Rozeboom incorporates the foregoing factual statements in paragraphs 1-69.

130. Section 27.01 of the Texas Business and Commerce Code creates a statutory cause of action for a victim of fraud in a stock transaction.

131.    The transaction between Rozeboom and Fennebresque was a transaction that concerned stock.

132.    During the 2017 and 2018 Transactions, Fennebresque made partial disclosures or failed to disclose relevant information, leaving a false impression about fundraising activities and the valuation of NAH and CWGC.

133.    Fennebresque had a duty to disclose such information given the fiduciary relationship between them, Fennebresque made a false impression by making a partial disclosure, and Fennebresque disclosed some information but not all relevant information.

134.    The facts that Fennebresque withheld were relevant and material to the transaction.

135.    Fennebresque withheld the material information to induce Rozeboom to sell Rozeboom's shares at an inadequate price.

136.    Rozeboom justifiably relied on Fennebresque's representations and failure to disclose material information.

137.    Rozeboom suffered injury as a direct and proximate result of Fennebresque's representations and failure to disclose material information.

**Counterclaim Count VIII: Insider Trading Violations Under Section 20A of the Act (Fennebresque)**

138.    Rozeboom incorporates the foregoing factual statements in paragraphs 1-69.

139.    In the 2017 and 2018 Transactions, Fennebresque committed insider trading by purchasing securities while aware of material, non-public information.

**Counterclaim Count IX – Breach of Fiduciary Duty Regarding the 2017 Redemption Transaction, the 2017 Transaction, and the 2018 Transaction (CWGC)**

140.    Mr. Rozeboom incorporates the foregoing factual statements in paragraphs 1-69.

141.    CWGC was a fiduciary to Rozeboom in the 2017 Redemption Transaction, the 2017 Transaction, and the 2018 Transaction.

142.     CWGC breached its fiduciary obligations to Rozeboom through Mr. Snyder's actions by, among other things the failure and/or refusal to provide Rozeboom with accurate material information about CWGC's membership, valuation, and activities affecting the value membership in connection with the transaction among other material lapses.

143.     As a direct and proximate result of CWGC's breach of fiduciary duties, Rozeboom sold his shares at an inadequate price to CWGC as well as to Fennebresque and several occasions and the parties improperly retained such benefits.

**Counterclaim Count X – NAH and CWGC Are Liable for Fennebresque's Section 10(b) Violations In The 2018 Transaction and Insider Trading Under Section 20A Under Respondeat Superior/ Agency Liability/and Section 20(a) of the Exchange Act**

144.     Rozeboom incorporates the foregoing factual statements in paragraphs 1-69.

145.     As Chairman and CEO of CWGC and NAH, Mr. Snyder helped Fennebresque



**Counterclaim Count XI: Violation of Section 10(b) of the Securities Exchange Act of 1934 with Respect to the 2017 Redemption Transaction – CWGC**

147.     Mr. Rozeboom incorporates the foregoing factual statements in paragraphs 1-69.

148.     Mr. Snyder is the managing member of CWGC and was in possession of material, non-public information regarding the value of Company shares.

149.     As managing member of CWGC, Mr. Snyder's knowledge is properly imputed to CWGC.

150.    CWGC was in possession of material non-public information both imputed to the Company due to knowledge obtained by its managing member, Mr. Snyder, as well as through its purchase of NAH securities at a ▮▮▮▮▮▮▮ valuation.

151.    By soliciting the redemption of Rozeboom's membership interests and redeeming those same securities, CWGC traded in its own stock.

152.    When in possession of material, non-public information, CWGC is an insider with respect to Company securities.

153.    As an insider, CWGC has a duty to disclose the material non-public information or abstain from trading.

154.    CWGC committed insider trading in the 2017 Redemption Transaction, in violation of section 10(b) of the Exchange Act of 1934.

## DEMAND FOR A TRIAL BY JURY

Rozeboom demands a trial by jury on all claims, defenses, and issues asserted by Fennebresque and herein.

## PRAYER

WHEREFORE, Rozeboom respectfully prays that this Court enter judgment in his favor and against Fennebresque and award Rozeboom:

a.   Actual damages in an amount to be proved at trial;

b.   Rescission of the 2017 and 2018 Transactions;

c.   Exemplary or punitive damages;

d.   A constructive trust be placed over the money in Fennebresque's possession in the sum of the difference between the true value of Rozeboom's shares at the time of the 2017 and 2018 Transactions and the sale price;

e. Disgorgement of the money which Fennebresque has unlawfully and unfairly retained as a result of the 2017 and 2018 Transactions;

f. Disgorgement of the money which CWGC has unlawfully and unfairly retained as a result of the 2017 Redemption Transaction;

g. Attorney's fees;

h. All costs incurred;

i. Pre-judgment and post-judgment interest; and/or

j. Any and all other relief to which the Court may find that he may be entitled under law or equity.

Dated: August 18, 2020

Respectfully submitted,

*/s/ Gregory A. Brassfield*
Kent Krabill
kkrabill@lynnllp.com
Gregory A. Brassfield
gbrassfield@lynnllp.com

**LYNN PINKER HURST SCHWEGMANN LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839

**ATTORNEYS FOR DEFENDANT/COUNTER-DEFENDANT ROZEBOOM**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 18th day of August, 2020, he did cause to the foregoing to be filed in the Court's CM/ECF system, which will then electronically notify all counsel of record, including:

Daniel H. Charest
LeElle Slifer
E. Lawrence Vincent
Mallory Biblo
dcharest@burnscharest.com
lslifer@burnscharest.com
lvincent@burnscharest.com
mbiblo@burnscharest.com


/s/ Gregory A. Brassfield
Gregory A. Brassfield

| | |
|---|---|
| **From:** | Greg Brassfield |
| **To:** | LeElle Slifer; Daniel Charest |
| **Cc:** | Joshua Lang |
| **Subject:** | RE: Fennebresque v. Rozeboom |
| **Date:** | Friday, August 14, 2020 7:30:00 PM |

So sorry for the delay. I've conferred with the client. We agree to the outlined proposal and accordingly, will withdraw the opposition to your motion for leave to amend.

Thanks,

**GREG BRASSFIELD | Attorney**
**LynnPinkerHurstSchwegmann**
Direct    214 981 3827
Mobile   214 883 7506
Fax       214 981 3839
gbrassfield@lynnllp.com

2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
**lynnllp.com**

**From:** LeElle Slifer <lslifer@burnscharest.com>
**Sent:** Friday, August 14, 2020 4:07 PM
**To:** Greg Brassfield <gbrassfield@lynnllp.com>; Daniel Charest <dcharest@burnscharest.com>
**Cc:** Joshua Lang <jlang@lynnllp.com>
**Subject:** Re: Fennebresque v. Rozeboom

Hi Greg, just finished my depo.  Yes, that is our agreement, please let me know if you're confirmed since I'm unsure if SRP is still up in the air.

**LeElle Slifer** | Burns Charest LLP
Direct: 469.904.4562  Mobile: 817.371.9978

**From:** Greg Brassfield <gbrassfield@lynnllp.com>
**Date:** Friday, August 14, 2020 at 1:58 PM
**To:** Daniel Charest <dcharest@burnscharest.com>
**Cc:** LeElle Slifer <lslifer@burnscharest.com>, Joshua Lang <jlang@lynnllp.com>
**Subject:** Re: Fennebresque v. Rozeboom

Thank you.

Sent from my iPhone

On Aug 14, 2020, at 1:57 PM, Daniel Charest <dcharest@burnscharest.com> wrote:

EXHIBIT B

LeElle is in the depo, so I am confirming this is the proposal. Thanks.

Daniel H. Charest
469.904.4555 direct
214.681.8444 mobile

> On Aug 14, 2020, at 14:27, Greg Brassfield <gbrassfield@lynnllp.com> wrote:
>
> LeElle:
>
> Thanks for your time this morning and for the follow-up call. I think your proposal sounds very reasonable. I do want to be able to talk it through with the client, which I haven't been able to do yet. I'll reach out just as soon as I am able to explain how we're proceeding with Mark. I know you're in a deposition, but when you get a moment will you confirm if the following correctly summarizes the proposal we discussed:
>
> - I will withdraw my opposition to your motion for leave to amend to include the defamation allegations regarding Nick Snyder.
> - You will not oppose my motion for leave to join NAH and CWGC on the theory that they have secondary liability for the underlying securities claims against Billy. Also, following third-party discovery if we undertake to join the SRP entity Billy referred to in discovery, you will not oppose on the basis that the deadline to join parties elapsed.
> - We will both preserve our rights to file any other challenges, including dispositive challenges (*i.e.*, no waiver of any other rights).
>
> Is that right?
>
> Again, I'll confirm in writing ASAP once I talk to the client about how we intend to proceed.
>
> Thanks,
>
> **GREG BRASSFIELD  |  Attorney**
> **Lynn**Pinker**Hurst**Schwegmann
> Direct    214 981 3827
> Mobile   214 883 7506
> Fax       214 981 3839
> gbrassfield@lynnllp.com
>
> 2100 Ross Avenue, Suite 2700
> Dallas, Texas 75201
> **lynnllp.com**
>
> The information contained in this communication is confidential, may be attorney-client privileged,

**EXHIBIT B**

may constitute inside information, and is intended only for the use of the addressee. It is the property of Lynn Pinker Cox & Hurst, LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail, and destroy this communication and all copies thereof, including all attachments.